[Crim. No. 1155. Third Appellate District.—June 16, 1931.]

THE PEOPLE, Respondent, v. FRANK COUNTRYMAN et al., Appellants.

Clinton W. Johnson for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

PRESTON, P. J.—The defendants were charged by an information containing two counts with a violation of the provisions of the "Still Act" (Stats. 1927, p. 497). The first count charged the possession of a still and the second its operation. All the appellants above named, together with Mike Riley, were tried together before a jury. Frank Countryman was convicted of the possession of a still and Joe D. Countryman and Lige Taylor and Mike Riley were convicted of operating a still.

All of the defendants moved for a new trial, which motions were denied and judgments were imposed.

This appeal is by Frank Countryman, J. D. Countryman and Lige Taylor, the defendant Mike Riley having taken a separate appeal.

The facts, which are practically uncontradicted, are briefly these: During the months of January and February, 1931, P. J. Marcus and wife resided in the city of Oroville, but owned a small ranch near Palmero in Butte County, which was unoccupied. On the place was a dwelling, chicken-house, outbuildings and a small orchard. Early in January, 1931, the defendant Frank Countryman, came to the Marcus home in Oroville and inquired of Mrs. Marcus if the *buildings* on the ranch were for rent. Mrs. Marcus replied that the buildings were vacant and that she would be willing to rent them. He replied: "Maybe I can rent it for you." He returned within a few days in company with another man, whose identity was not established, and stated to Mrs. Marcus: "We want to go out and look at the place." Mrs. Marcus replied: "Go ahead." With this Frank Countryman and the other party drove away in the direction of the ranch. Within a day or two Frank Countryman returned to the Marcus home and said to Mrs. Marcus: "They will take the place and I want to pay you." Thereupon he paid Mrs. Marcus $25 and said to her: "The buildings are locked," whereupon Mrs. Marcus delivered to him the keys and he departed.

Thereafter and on Thursday morning, January 29th, P. J. Marcus went to the ranch for the purpose of doing some work in the orchard. In the forenoon of that day he did not see any of the defendants. However, in the afternoon he met the defendant Taylor, and after some conversation in which he told Taylor he was the owner of the place, Marcus returned to his home in Oroville. The next day he saw Taylor and Riley in and about the place, but had no conversation with either of them. Marcus returned to the ranch again on Saturday, and during the forenoon had an extended conversation with both Taylor and Riley, and in the course of this conversation they informed him that there was a still on the place and they took him over to the barn and showed the still to him and said that it belonged to Frank and Joe Countryman.

At this time the still was in full operation. Near the still were two or three 50-gallon tanks full of whisky. Marcus demanded of Taylor and Riley that the still, liquor and equipment be immediately removed from the ranch. They replied: "We are working for Frank and Joe Countryman

and you will have to see Frank Countryman, as he is the 'boss'.'' Marcus immediately left the ranch, went to the residence of Frank Countryman and there met both Frank and Joe Countryman, and directing his conversation to Frank, said: "There is a still over on the ranch and you will have to get it off." Frank Countryman replied: "If you won't say nothing and leave it there I will move it out tonight."

Thereupon Marcus returned to the ranch, reaching there about 3 P. M. He immediately went to the place where the still was located and on entering the door, he claims that Taylor struck him on the head and knocked him unconscious. The record is not clear as to just what happened around the place between 3 P. M. and 6 P. M. of that day. However, about 6 o'clock that evening Joe Countryman and a man by the name of Clark came to the Marcus ranch, presumably in response to a phone call from the defendant Riley. When they reached the ranch they found Riley sitting alongside of the road in the rain with a dog in his lap. Joe Countryman spoke to him, saying: "What is the trouble?" Riley replied: "Marcus is over at the joint, drunk and raising hell over there."

The three proceeded to the building where the still was located. At the entrance they found Marcus lying on the steps in a semi-conscious condition. One witness described his condition as "crazy drunk". Going inside they found whisky all over the floor, Taylor was lying on his back on the floor near the still in an unconscious condition with "blood running out of both sides of his mouth and pale as a ghost". Being unable to arouse Taylor they dragged him to another portion of the building where the floor was dry, and then turned their attention again to Marcus. By this time Marcus was able to make a few incoherent remarks. Joe Countryman tried to arouse Marcus and shook and hit him several times, accused him of dumping the whisky out on the floor, and said, among other things: "It costs $1.50 a gallon to make this whisky . . . and you are going to pay for it." Marcus replied: "Joe, if I dumped the whisky out, I will pay for it." Further argument ensued and finally Joe Countryman turned to Clark and said: "You stay here and I will go and get Frank." Clark protested and after further conversation, it was decided to prepare a promissory

note for Marcus to sign in payment for the liquor destroyed. Clark prepared the following document:

"Palermo, Calif.
"Jan. 31, 1931.

"Be it known that I, P. J. Marcus have borrowed $150.00 One Hundred and fifty Dollars from J. D. Countrymans and F. D. Countryman promise to pay one third sum $50.00 on the fifth day of February 1931 and balance $100.00 due in 30 days from date of first payment.

"P. J. MARCUS

"Witnesses:
"C. L. CLARK
"M. J. RILEY"

This document was signed by Marcus and witnessed by Riley and Clark. By this time Taylor and Marcus had both revived somewhat and all became friendly. Joe Countryman attempted to put the place in order and kindle a fire under the still. After all present had a few more drinks, they departed for home. Marcus, on reaching his car found a gallon of whisky in the tonneau and also a number of empty bottles and jugs. He also found that his car had been recently driven.

On the way home Joe Countryman made this remark to Clark: "This is a fine note for this to happen when this place would have been all cleaned up tomorrow." Frank C. Countryman was not on the ranch that night. On the following morning Mrs. Marcus, in company with the officers, went to the ranch and there found the still in full operation and Taylor and Riley near by. The arrest and prosecution of all the defendants followed, with the result above set forth.

The defendants contend that the court erred in giving to the jury the following instruction:

"That any person who owns, operates or knowingly possesses any still which is designed or intended for the manufacture of intoxicating liquor is guilty of an offense. Any person whether acting knowingly or in his own behalf or as the agent, servant, officer or employee of any other person, firm, association or corporation who shall be the owner of or who shall operate or knowingly have in his possession any still used, designed or intended for the manufacture of intoxicating liquor shall be guilty," etc.

The vice of this instruction is that it omits the words "for beverage purposes". The rule is well established that in determining the propriety of an instruction the entire charge must be considered and if, as a whole, it clearly states the law, it is free from error. (*People* v. *Del Cerro,* 9 Cal. App. 764, 769 [100 Pac. 887]; *People* v. *Warren,* 130 Cal. 678 [63 Pac. 87]; *People* v. *Besold,* 154 Cal. 363 [97 Pac. 871]; *People* v. *Attema,* 75 Cal. App. 642 [243 Pac. 461].)

In the case at bar the court impressed upon the jury by instructions in varying forms the proposition that, in order to justify a conviction of the defendants, or any of them, the prosecution must establish *beyond a reasonable doubt every element of the offense charged in the information;* and that the defendants, and each of them, were entitled to an acquittal, unless their guilt, and the guilt of each of them, of *the crime charged in the information and every essential element therein, was established beyond a reasonable doubt.*

The court, before giving the instruction complained of, read to the jury the information, which properly charged the defendants with "having in their possession and control a still and stilling device, intended for use and used in the manufacture and production of intoxicating liquors, *for beverage purposes",* and, also, with "knowingly operate and cause to be operated a still and still device, intended for use and used in the manufacture and production of intoxicating liquor, *for beverage purposes",* and immediately following the instruction complained of, the court instructed the jury as follows:

"You cannot find these defendants or either of them guilty unless you believe from all the evidence and by the circumstances surrounding the case, . . . unless you believe beyond a reasonable doubt that they are guilty *of the offense charged."* Again, the court instructed the jury as follows:

"In order to justify a conviction, the prosecution must establish, beyond a reasonable doubt, *every essential element of the alleged crime* and the defendants are entitled to an acquittal unless their guilt of a crime embraced in the charge, and every essential thereof, was established beyond a reasonable doubt."

Indeed, the instructions covering this phase of the case were so full and numerous that we cannot undertake to

quote all of them at length here. The excerpts above set forth will suffice.

It is true that the trial court inadvertently used the words "fit for beverage purposes" in one part of the charge to the jury. However, when the entire charge is taken as a whole, we are confident that the jury were not misled by the omission of the words "for beverage purposes" in the instruction complained of, or by the addition of the word "fit" in another part of the charge, but on the contrary, we are satisfied that the jury fully understood that to warrant a conviction they must find beyond a reasonable doubt that the operation and possession of a still was for the manufacture of intoxicating liquors *"for beverage purposes"*.

█ Near the close of the trial, and during the noon recess, the attorneys for both sides met in the judge's chambers and the learned trial judge said to the attorneys:

"The Court now holds that there is no evidence whatever produced up to this time to show that P. J. Marcus is an accomplice and that there has been no evidence to show that any witness is an accomplice except that it be the witness Clark." To these remarks of the court the attorney for the defendants replied: "The defendants offer and request to be permitted to argue to the jury upon the evidence thus far submitted that the witness Marcus is an accomplice." After some discussion between the attorneys and the court, the court said: "Yes, the question to argue, the question to the jury that Marcus is an accomplice, cannot be based upon any evidence so far submitted and therefore the Court declines to permit counsel for the defendants to state in any manner to the jury that he is an accomplice."

Defendants contend that their attorney was by these remarks of the judge denied the right to contend and argue to the jury that P. J. Marcus was an accomplice. We find no merit in this contention for at least two reasons: 1. The discussion between the judge and counsel was not in open court before the jury and did not constitute a final ruling in the case. The record fails to show that counsel offered in open court to argue that Marcus was an accomplice and that he was denied that privilege. There is nothing in the record to show that counsel did not make to the jury all the argument desired relative to the witness P. J. Marcus being an accomplice; 2. An examination of the entire record con-

vinces us that the learned trial judge was correct in his conclusion that there was no evidence in the record upon which Marcus could be held to be an accomplice. The most that could be said of Marcus' status is that he was a consumer of the defendants' illicitly manufactured liquor.

After a careful examination of the entire record we are satisfied that the evidence is sufficient to sustain the judgment against all of the defendants and that there is no prejudicial error in the record.

The judgment in each case and order denying a new trial in each case are affirmed.

Thompson (R. L.), J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 1, 1931.