[Civ. No. 13789. Second Dist., Div. Three. May 25, 1943.]

WEST COAST LIFE INSURANCE COMPANY (a Corporation), Appellant, v. LAUREL HARVEY CRAWFORD et al., Defendants; MILTON M. COHEN, JR., as Administrator, etc., Respondent.

(Three Cases)

Keesling, Smith & Wayland, Keesling, Wayland & Keil and De Lancey C. Smith for Appellant.

Milton M. Cohen in pro. per., Alfred F. MacDonald and Jerome H. Kann for Respondent.

BISHOP, J. pro tem.—The plaintiff in these three consolidated cases appeals from a judgment providing not only that it take nothing by virtue of its endeavor to rescind five life and accident insurance policies, but that, in its role as cross-defendant, it should pay the sums set forth in the policies it had sought to have cancelled. We have reached the conclusion that the judgment should be reversed because of the rejection of an exhibit important to the proof of plaintiff's cases and to its defense against the cross-actions brought upon the policies.

In each of the three consolidated actions resulting in the judgment appealed from it was alleged and found to be true that Laurel Harvey Crawford had applied for, and the plaintiff had issued, life insurance policies on Crawford's three minor children, and accidental death policies on the two of the three who were old enough to be the subjects of such policies. In each of these policies Crawford was named as beneficiary. Some seven months after receiving the last of these policies Crawford murdered his three children. Plaintiff's position was that there had been on Crawford's part a fraudulent concealment of a material fact, that fact being Crawford's intention, in existence at least by the time the policies were issued, himself to take the lives of his children. The trial court found that no such intention existed, and as a necessary consequence decreed that the plaintiff take nothing. No one is questioning plaintiff's position that if Crawford had the intention to murder his children, his concealment of that intention, up to the time that the policies were issued, was fraud warranting a rescission of the policies. (*Pierre* v. *Metropolitan Life Insurance Co.*, (1937) 22 Cal.App.2d 346, 350 [70 P.2d 985, 987].)

In each of the policies Crawford was named as beneficiary, his wife to be the beneficiary if he should fail or not survive. Crawford forfeited all his rights as a beneficiary when he murdered the insured, so that neither he nor the defendants who claim through him have any right to the proceeds of the policies. (*Meyer* v. *Johnson*, (1931) 115 Cal.App. 646, 647

774

[2 P.2d 456].) At the same time that he took the life of his children Crawford murdered his wife, who was also insured. This left no designated beneficiary, with the result that Milton M. Cohen, Jr., who had been appointed administrator of the several estates of the children, by way of cross-actions presents the claims of the estates for the proceeds of the policies. The plaintiff, as cross-defendant in the three actions, defends on the same ground of fraudulent concealment as that upon which it bases its three actions. It also interposed special defenses which we shall consider in due course. Crawford's murder trial, to which we shall have occasion to refer, resulted in a judgment of conviction, affirmed on appeal in *People* v. *Crawford*, (1940) 41 Cal.App.2d 198 [106 P.2d 219]. The details of the murder, engineered to make it appear that an automobile accident had occurred, are not contained in the incomplete record of the evidence before us and we are not assuming that they were proved in this case.

Plaintiff's attack upon that part of the judgment decreeing that it take nothing is made, not upon the ground that the evidence received does not support the finding upon which the judgment was based, but upon the ground that the trial court erred in refusing to admit in evidence, and then in rejecting an offer of proof respecting, a piece of paper which would have supported a finding in plaintiff's favor. We shall call this piece of paper exhibit 7 although it was not received in evidence but only so marked for identification.

Looked at in the light of the evidence which was before the court when exhibit 7 was rejected, this exhibit might have been seen to cast a most sinister shadow across all five of the policies issued to Crawford on the lives of his children. In making this statement we are not substituting our viewpoint of the facts and the inferences which should be drawn therefrom for that of the trial judge. ■ It is true that "whether [an] inference shall be drawn, in any given case, is a question of fact"; but it is also true that "Whether a particular inference can be drawn from certain evidence is a question of law," both quotations being taken from *Blank* v. *Coffin*, (1942) 20 Cal.2d 457, 461 [126 P.2d 868, 870]. ■ All that we are stating is that as a matter of law inferences favorable to the plaintiff could have been drawn from exhibit 7 had it been received in evidence. The possibility that the trial judge would not have drawn such inferences does not retrieve from error the ruling rejecting the exhibit (*Mashbir* v. *Mashbir*, (1938) 29 Cal.App.2d 733 [85 P.2d 482].) Obviously, a re-

fusal to permit a party to testify concerning a disputed fact could not be defended on the ground that had he testified the trial judge could have disbelieved him because he was partisan, and so not worthy of belief. Exhibit 7, as we shall see, was full of meaning to one who would read between the lines. Its rejection cannot be justified because the trial court would not have been obliged to read between the lines.

To one not familiar with the admissions of the pleadings and with the evidence which had been received, this exhibit would have little meaning.

EXHIBIT 7.

But the trial judge, who was sitting without a jury, was in a more favorable situation. He knew that by the pleadings of all parties it was agreed that in December of 1939 Crawford had wilfully murdered his wife and their three children. He knew that by the pleadings the main issue of fact before him was this: when did the intent to murder find lodgment in Crawford's mind? The trial judge could, we can almost say must, have noted at once the strange coincidence respecting the two columns of figures appearing at the left of the exhibit. This exhibit, it should be noted, had been written entirely by Crawford. Crawford, no longer a resident of Los Angeles County, was not a witness at the trial of these cases, but Deputy District Attorney Barnes was, and he was permitted without objection to relate some of the statements Crawford had made as a witness when he was on trial for his life. A trier of fact could conclude that embarrassing statements made by Crawford as a witness on trial for murder would not have been made unless their very truth required their utterance. So, the trial court must have believed, Crawford wrote exhibit 7, because he had testified that he wrote it. Mr. Clark Sellers, the nationally recognized handwriting expert, later on testified that it was his very definite conclusion that Crawford wrote all the words and figures on the exhibit. The bottom figure "3" of the column which was totaled up to 45,500, represented, so Crawford stated, some automobile insurance. The figure "5," just above it, referred to a $5,000 accident policy which he then had on his wife.

What of the other figures in the two columns? By a strange coincidence these too are the same as the amounts of insurance for which he had made application. A Mr. Primeaux had testified that in response to Crawford's written request to the plaintiff he, the agency manager of plaintiff's Pasadena branch office, had called upon Crawford early in September, 1938. Crawford had been shopping around for the lowest rates, he told Primeaux, and found plaintiff's to be the best. Four applications for insurance were signed by Crawford on September 14. One was for a life policy on his seven-year-old daughter Helen. (This policy, in the amount of $3,500 is the policy involved in the action with the superior court number 456,584.) The second application resulted in the issuance of a life policy in the sum of $4,000 upon nine year old

Paul. Because Paul was under ten years of age at the time (September, 1938), an accidental death policy could not be issued. This was explained to Crawford, who responded that he would apply for the double indemnity when the boy reached ten. This he did, and under date of May 10, 1939, an "Accidental Death or Dismemberment" Policy, increasing the value of his son's death to him to eight thousand dollars, was received by Crawford from the plaintiff. (These two policies are the subject matter of the action bearing the superior court number 456,585.) Upon his fourteen year old daughter Alice, Crawford obtained double insurance: $5,000 on her life and an additional $5,000 should her death be accidental. (These policies are the subject matter of plaintiff's third suit, bearing superior court number 456,586.) The fourth application that Crawford signed was for an $8,000 policy on his wife's life, doubling to $16,000 in case of accidental death.

What other conclusion does common sense permit than this? Crawford, having obtained some insurance, having applied for more, and planning to apply for still another policy, all of which would become payable to him should an automobile accident snuff out the lives of his wife and three children, employed exhibit 7 to figure out what sum the several policies would bring him, and the answer was $45,500. If it be said that other conclusions are possible, it remains true that the conclusion we have expressed is certainly one that could logically have been made.

We find other computations on the exhibit. Under the words "cash refund annuities per 1000—45.93 for life," written by Crawford, we find the figure "40,000" encircled, and then the figures "45.93" multiplied by 40. The "45.93" must have rung a bell in the trial court's memory. This was the figure given to Crawford by Primeaux, in response to the latter's request for information concerning what he would receive as an annuity each year for life for each $1,000 he paid the plaintiff. If he took $40,000 of the $45,500 insurance he would collect if all his dear ones should die in an automobile accident and invested it in annuity contracts, what would his yearly take be? $1,837.20, according to the calculations Crawford made on exhibit 7. How much would this amount to each month? Divide $1,837.20 by 12, as Crawford did, and you have the answer: $153.10.

Along the lower edge of the exhibit we find that Crawford had made another computation; this time, according to his statements, he had figured up what his present income was. The top figure, 62, was his wife's earnings, then three rents, then government compensation, and lastly, government insurance, a total expressed in dollars and cents, of $284.22. Before adding his then income, inferentially figured on a monthly basis, to the monthly income which he would receive if all his insurance investments were harvested and reinvested in annuities, a subtraction is necessary; his wife's earnings must be deducted, for you cannot eat your cake and have it too. So we find Crawford's figures: 284.22 minus 62, leaves 222.22. Now to that amount may be added the anticipated annuities, reduced to a monthly basis, and you have the total: $375.32.

The picture is not complete without some other bits of evidence. Crawford at the time Primeaux first called on him, casually said "he had some funds that probably he would invest into an annuity later on." The business at hand, on that occasion, however, had to do with a discussion of rates, leading to the making of the applications for the policies on his wife and three children, on September 14, 1938. Ten days or two weeks later Crawford came to Primeaux's office and inquired about single premium annuities. It was at this interview that he obtained the figure "45.93" which he used in his computations, on exhibit 7, and at this interview "he mentioned . . . that he possibly might come into a large sum of money and might invest into this annuity." The fact was, according to Crawford's testimony at the murder trial, that he had no $40,000 to invest in annuities, but that he did figure the possible returns on this basis.

All the policies applied for on September 14 were issued on October 11, except that the policy of $8,000-$16,000 covering his wife's life was issued for $8,000 only; it did not double in case of accidental death. Crawford did not like the rejection of his application for double indemnity on his wife, according to Primeaux, and on November 22, 1938, requested the company to cancel the policy, which was done. It was before November 22 that he did the figuring on exhibit 7, according to his reported testimony (an earlier date was of no importance at the murder trial). On the exhibit, however, the figures "8-16" top the list, and without the "16" the total would fall below $40,000. The conclusion would be

justified, therefore, that when Crawford made the computations on exhibit 7 he did not know that the eight doubling to sixteen thousand dollar policy had been issued only for eight thousand dollars, so that the sixteen thousand was not to be counted on. In other words, the exhibit, as we have noted its figures and notations, was written before the policies were issued.

It is true, there is other evidence, which we have not reviewed, which might cast doubt upon some of that which we have mentioned, and there are some figures on the exhibit that remain unexplained and some which may have been added even after November 22. But, we reiterate, our thesis has not been that if exhibit 7 had been introduced the finding would have been required that Crawford had defrauded the plaintiff. We do insist, however, that a person of ordinary common sense, with the exhibit and the evidence before him, could with reason say: It appears clear to me that before Crawford received the policies on the lives of his children, months before applying for and receiving the additional dismemberment policy on his son Paul, he intended to cash in on those policies by doing that which he ultimately accomplished; that is, he intended himself to cause their deaths.

Occasionally a conflict appears to exist between a rule of law and the dictates of common sense. Such conflicts are at times inescapable, but more often justify a careful reexamination of the rule of law; it may be either unsound or other than it seems to be. We have discussed somewhat fully the matters involved in and surrounding the rejected exhibit because of the possibility that in them is enmeshed such a conflict, a conflict between the rule governing in everyday affairs and that which is sometimes offered as a rule of evidence, the rule that ''an inference may not be based upon an inference.'' We have reached the conclusion that there is no such rule in this state save where the second inference does not follow logically from the fact established by the first inference.

An interpretation of the rule that would result in its forbidding the use of exhibit 7 in a chain of reasoning, would make it conflict with the rule of daily experience. Let us suppose a man is found dead, with a cut in his heart an inch wide. At his side is a bloody knife with a blade an inch wide, and a blood stained handle bearing fingerprints. An

acquaintance of the slain man is found to have fingerprints matching those on the handle. This acquaintance was reported to have said a week before the incident: "I have warned him not to cross my path again." A group of ordinary citizens would conclude, in the absence of any satisfactory explanation, that the man had been deliberately slain by his acquaintance, arriving at this conclusion by adding inference to inference to inference. Would a group of judges be compelled to resolve that the evidence was legally insufficient to enable them to affirm a conviction of murder in the first degree? Of course not. (See *People* v. *Reed*, (1941) 17 Cal.2d 405 [110 P.2d 394], and *People* v. *Walsh*, (1942) 50 Cal.App. 2d 164 [122 P.2d 671].) The explanation may be made that the rule does not ban a course of reasoning which adds inference to inference, so long as any inference is not based upon a prior inference. What then of our supposititious case, and of *People* v. *McQuate*, (1934) 2 Cal.2d 227 [39 P.2d 408] and *People* v. *Greig*, (1939) 14 Cal.2d 548 [95 P.2d 936], where the facts of intent were inferred from facts established by inferences? Section 1832, Code of Civil Procedure, illustrates its definition of indirect evidence with this statement: "For example: a witness proves an admission of the party to the fact in dispute. This proves a fact, from which the fact in dispute is inferred." In the McQuate case a fact that was proved by direct evidence was defendant's statement that he had attempted to dig a grave two days before the killing took place. From the defendant's making of this statement it was inferred that he did his work on the grave on Wednesday. From the fact thus legally proved, it was inferred that on Wednesday he had an intent to kill his victim. Still a further inference is involved, (is it not?) that on Friday, when the killing took place, it was deliberate, because the intent of Wednesday still persisted.

In only two cases in this state, so far as we are aware, has there been any discussion of the so-called rule. The first of these is the case of *People* v. *Graves*, (1934) 137 Cal.App. 1 [29 P.2d 807, 813, 30 P.2d 508], where the conviction of the defendant on a charge of bribery was upheld, although the evidence was entirely circumstantial. The court said (p. 14): "Courts have sometimes used the expression that an inference cannot be based upon an inference and appellant has sought to apply this principle as a reason for rejecting the

evidence under consideration. In the first place, the expression itself is far from an accurate one. Just as the language we speak is said to be made up of dead metaphors, so our ordinary statements as to facts are really made up of dead inferences. These inferences are so intimately associated with known or obvious facts that we habitually accept them as facts. Wigmore, at section 41, volume 1, of his treatise on evidence, says flatly, 'there is no such rule, nor can be.' But using the term as loosely as you please, how does it apply to the situation here? The fact is the large amount of currency was withdrawn from the bank. We know by inference from other facts that on the same day appellant had a large sum of currency in hand. We know from other facts and inferences all of the other circumstances. It is from the reasonable relation of all of these separate relevant facts each to the other that an inference of the greater fact, to wit, the corrupt agreement and its consummation, is drawn.''

The second case in California, coming to our attention, which discusses the epigram that one inference may not be based on another is *Paiva* v. *California Door Co.*, (1925) 75 Cal.App. 323, 330 [242 P. 887]. This quotation sets forth the problem before the court, and the court's comments upon it: ''From the extent to which this stump had been burned it is evident that it must have commenced to burn at a time prior to September 18th. Since no fires were kindled on defendant's premises on the 17th, it logically follows that it must have been burning on the morning of that day and prior thereto. Taking it, then, as a justifiable inference that the stump was burning on Monday morning and giving consideration to the further proved fact that a strong wind was blowing past the stump in the general direction of the place where the fire started, it would not be unreasonable, in the absence of other explanation, to infer that the fire was caused by sparks from the burning stump. [Citing cases.]

''Respondent contends that the foregoing reasoning is faulty in that 'an inference cannot be based on another inference.' The second inference is not based upon the first inference alone, but upon the inferred fact that the stump was burning and the further fact, proved by direct evidence, that a strong wind was blowing from the stump toward the origin of the fire. The statement that an inference cannot be based upon another inference appears itself to be based upon an unsub-

stantial foundation. 'An inference is a deduction which the reason of the jury makes from the facts proved, without an express direction of law to that effect.' (Code Civ. Proc., sec. 1958.) 'An inference must be founded on a fact legally proved.' (Code Civ. Proc., sec. 1960.) Facts established by circumstantial evidence are 'proved' and 'legally proved,' and the foregoing sections do not provide that the facts upon which an inference may be founded must be proved by direct evidence. To hold that an inference cannot be based upon facts inferred from testimonial evidence would be to confine circumstantial evidence within narrow limits. In Wigmore on Evidence, section 41, it is said: 'It was once suggested that an "inference upon an inference" will not be permitted, i. e., that a fact desired to be used circumstantially must itself be established by testimonial evidence; and this suggestion has been repeated by a few courts, and sometimes actually enforced. There is no such rule; nor can be. If there were, hardly a single trial could be adequately prosecuted. . . . In . . . innumerable daily instances we build up inference upon inference, and yet no court ever thought of forbidding it. . . . The judicial utterances that sanction the fallacious and impracticable limitation, originally put forward without authority, must be taken as valid only for the particular evidentiary facts therein ruled upon.' "

Hearings in the Graves case and in the Paiva case were denied by the Supreme Court, and in no subsequent case has an expression of doubt about the soundness of the conclusion there reached been voiced. We do have, however, some cases in this state where the rule there criticized is apparently used as the yardstick by which a chain of reasoning is measured and found wanting. We do not consider ourselves bound by the reference to the "rule" in these cases, however, because in none·of them was there a sound chain of reasoning. For example, in the only Supreme Court case which mentions the rule, *Hamilton* v. *Pacific Elec. Ry. Co.*, (1939) 12 Cal.2d 598, 601 [86 P.2d 829], it appears in this setting: "Indeed, considering the fact that at 8:30 o'clock p. m., many persons were making use of the waiting room, it is not improbable that during the time that plaintiff was an occupant thereof, several persons either did enter or leave it,—in which event it would have been possible that at any given moment of such time any one of them might have caused the oil to be depos-

ited upon the floor of the waiting room. However, in order to arrive at the indicated conclusion it would be necessary that one inference be made to depend upon a precedent inference; and, as has been repeatedly ruled, such a course of reasoning is not permitted in the law.'' No case was cited in support of this declaration, but these might have been, where reasoning as tenuous as that just noted was condemned. (*Tucker* v. *City of San Francisco*, (1931) 111 Cal. App. 720, 726 [296 P. 101]; *Jenkins* v. *National Paint & Varnish Co.*, (1936) 17 Cal.App.2d 161, 169 [61 P.2d 780]; *People* v. *Kazatsky*, (1936) 18 Cal.App.2d 105, 110 [63 P.2d 299]. See, also, *Robbiano* v. *Bovet*, (1933) 218 Cal. 589, 597, 599 [24 P.2d 466].) We are of the opinion that in this state this quotation from 31 C.J.S. 728 aptly describes the status of the rule we have been discussing: '' . . . it has been broadly asserted in many decisions that inferences cannot be founded on inferences. This rule has been said to be not a rule of general application but a rule of reason governing only when the proved facts and their reasonable implications furnish no basis for agreement or disagreement by persons of average intelligence as to whether the *factum probandum* has been established; but there is in fact no rule of law that forbids the resting of one inference on facts whose determination is the result of other inferences. On the contrary, inferences may be based on facts whose determination is the result of other inferences, so long as the first inference is based on such evidence as to be regarded as a proved fact and the conclusion reached is not too remote.''

We conclude, therefore, that upon the entire evidence the finding would have been justified, had exhibit 7 been before the trial court, that Crawford entertained the intention of killing his children, before the policies were issued, for our decisions illustrate rather than deny the soundness of basing an inference on a fact established by a reasonable inference. Nevertheless it is possible that on a retrial the finding will be made that he did not at that time have such an intention. Respondent, relying upon a statement in *Estate of Moore*, (1923) 65 Cal.App. 29, 33 [223 P. 73], argues that if conflicting inferences may be drawn from the evidence, ''then there is nothing for the jury, or the trial court sitting without a jury, but mere guesses or conjectures.'' This, of course, is not the law. (*Medico-Dental etc. Co.* v.

*Horton & Converse,* (1942) 21 Cal.2d 411, 436 [132 P.2d 457, 471], and cases cited.)

The possibility of a finding adverse to plaintiff, on a new trial, warrants us in considering some further points presented upon this appeal. Part of the evidence touching upon exhibit 7, and furnishing the basis for our recital of the facts, was incompetent, and had a proper and timely objection been made it would doubtless have been excluded. ■ We have in mind the testimony by Deputy District Attorney Barnes as to what Crawford said had been done by him. This was, of course, direct evidence that Crawford had so stated, but of the facts which were contained in Crawford's statements the testimony was hearsay. Insofar as it constituted admissions against Crawford's interest it was admissible, as we are about to see, against Crawford and the defendants who claimed by assignment from him, but not against the administrator. ■ However, no objection was made, and it is established that evidence, though incompetent, received without objection is sufficient to support a finding. (*Powers* v. *Board of Public Works,* (1932) 216 Cal. 546, 552 [15 P.2d 156], *Nelson* v. *Fernando Nelson & Sons,* (1936) 5 Cal.2d 511, 518 [55 P.2d 859]) so we did not hesitate to use it in our recital of the facts. An offer of proof was made, after exhibit 7 was rejected, consisting in large measure of further statements made by Crawford when a witness. To this offer, however, objection was made and sustained. ■ As to Crawford himself and the defendants claiming under him, his statements as a witness in the criminal trial might well have been received as admissions against his interest (secs. 1853, 1870, subd. 2, Code Civ. Proc.; *Griffin* v. *Jacobsen,* (1936) 17 Cal.App.2d 68, 70 [61 P.2d 350, 351]) but of the effect of the ruling in this regard plaintiff has voiced no complaint, doubtless because it recognizes that in reality it is not hurt by it. Crawford's statements, however, were inadmissible against the respondent. (*Griffin* v. *Jacobsen, supra.*) "The rights of a party cannot be prejudiced by the declaration, act, or omission of another, except by virtue of a particular relation between them . . . " (Sec. 1848, Code Civ. Proc.) No "particular relation" existed between Crawford and the respondent administrator at the time Crawford made the statements that plaintiff offered to prove. Any interest the administrator has in the proceeds of the life or accident

insurance policies comes, not as a successor of Crawford's right as a beneficiary, for by his own hand Crawford had destroyed himself as a beneficiary, with the result that there was none. The administrator represents the insured children and doubtless Crawford was their agent in securing their insurance so that his fraud, if established, would defeat their claims based on the policies, and statements he made in procuring the policies would be competent evidence. ██ But the statements sought to be introduced were not made in his activity as agent; they were made long after the agency had ceased to exist both because of the lack of live principals and because the duties of the agent had been completely discharged. In the premises the admissions of the agent were inadmissible against the principal. (*Taylor* v. *Bernheim*, (1922) 58 Cal.App. 404, 409, 410 [209 P. 55, 58]; 31 C.J.S. 1121.) The administrator cannot be said to be the representative of Crawford, as was found to be true in *McDonald* v. *Mutual Life Ins. Co.*, (1916) 178 Iowa 863 [160 N.W. 289], as we shall note later.

██ The plaintiff also complains of an adverse ruling on its offer of a letter written by Crawford to it, under date of November 30, 1938, containing this statement: "Mr. Primeaux will tell you that at the time I applied for these policies I also talked with him about putting $40,000.00 into one of your life Annuity policies." This letter would have warranted the drawing of an inference, against Crawford and his assignees only, that at the time he applied for the policies he talked about the annuity, but it is not competent evidence of anything against the respondent administrator, who objected to its introduction. Nor was it error to refuse to admit in evidence a $2,000 to $4,000 policy which Mr. Primeaux testified had been issued upon the life of Crawford's wife in the fall of 1939.

██ The plaintiff, now to be referred to as the cross-defendant, makes the contention, applicable alike to the life and the accidental death policies, that "There is no evidence in the case that there is anybody entitled to take the benefits of the policies involved except the murderer beneficiary who is barred from taking," citing these cases: *McDonald* v. *Mutual Life Ins. Co., supra*, 178 Iowa 863 [160 N.W. 289]; *Johnston* v. *Metropolitan Life Ins. Co.*, (1919) 85 W.Va. 70

[100 S.E. 865, 7 A.L.R. 823] and *Wickline* v. *Phoenix Mutual Life Ins. Co.*, (1928) 106 W.Va. 424 [145 S.E. 743]. These authorities would support cross-defendant's contention were it not for the fact that in this state it is wrong to assume that the beneficiary is an "anybody entitled to take the benefits of the policies." The two cases last cited dealt with a situation where, by the statutes controlling, had the representative of the insured's estate been permitted to recover on the policies, the probate court would have had no option but to distribute the proceeds to the murderer. To make effective the public policy that denies to a murderer fruit from his. crime, the denial of recovery on the policies was found necessary. (The McDonald case dealt with the admissibility of evidence.) These cases, however, point out that public policy does not relieve the insurer of its obligation, so that if the result of allowing recovery is not to enrich the murderer, recovery is proper. This is the law of this state. (*Meyer* v. *Johnson, supra*, 115 Cal.App. 646 [2 P.2d 456]), and the rule generally. (70 A.L.R. 1543.) In this state, contrary to the statute expressly relied upon in the Wickline case, Crawford cannot receive from the estates of his children the insurance recovered in these actions, for section 258 of the Probate Code provides: "No person convicted of the murder of the decedent shall be entitled to succeed to any portion of the estate; but the portion thereof to which he would otherwise be entitled to succeed goes to the other persons entitled thereto under the provisions of this chapter." Should it develop in the probate proceedings that there are no "other persons entitled thereto," the result would not be to authorize a distribution to Crawford; section 1027 of the Probate Code would then come into operation and the proceeds would go to the state. The problem of the distribution of the assets of the estates is one for the probate court, it was not ·involved in these actions.

 By way of defenses to the cross-actions on the two accident policies the cross-defendant alleged that the provisions of the policies, that affirmative proofs of loss had to be furnished within ninety days after the date of loss, were not complied with. The trial court found these allegations to be not true. This finding is not only not supported by but it is contrary to the evidence; the date of loss was December 11,

1939; the cross-complainant was appointed administrator in each estate June 25, 1940; proof of loss was not submitted to the company until January 13, 1941. The trial court did find that the cross-defendant denied all liability upon the insurance policies, but there was no finding of facts respecting the time and occasion of the making of this denial to justify the conclusion of law that "by reason of its denial" the cross-defendant "waived all requirements to be done or performed as a condition precedent. . . . "

The judgments appealed from are reversed.

Shinn, Acting P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied June 22, 1943, and the following opinion was thereupon rendered:

THE COURT.—At one point in our opinion we made the statement that "it is established that evidence, though incompetent, received without objection is sufficient to support a finding," having already noted that to the admission of the evidence which we were discussing, no objection had been made. In his petition for a rehearing respondent represents that he in fact did make objections but that they were omitted from the bill of exceptions, although he sought to have them included. If it would avail respondent aught we would grant a rehearing in order that such steps as might be found proper be taken to supplement the record now before us so that the objections he made during the trial would be included. However, the correction of the record requested would not be of benefit to the respondent, for "Where, as here, the insufficiency of the evidence is the question to be determined, full weight must be given to evidence which would have been excluded had objection been made, and even to evidence erroneously admitted against objection provided it be relevant. Evidence may tend to prove the issues and yet be incompetent." (*Holzer* v. *Read*, (1932) 216 Cal. 119, 123 [13 P.2d 697]. To the same effect: *Wright* v. *Roseberry*, (1889) 81 Cal. 87, 91 [22 P. 336]; *Archibald Estate* v. *Matteson*, (1907) 5 Cal.App. 441, 446 [90 P. 723]; *Globe Grain & Milling Co.* v. *Drenth*, (1919) 41 Cal.App. 604, 606 [183 P. 285]; *Hanrahan-Wilcox Corp.* v. *Jenison Machinery Co.*, (1937) 23 Cal.App.2d 642, 644 [73 P.2d 1241].) See, also,

*Mitchell Camera Corp.* v. *Fox,* (1937) 8 Cal.2d 192, 197 [64 P.2d 946] ; *Syar* v. *United States Fidelity & Guar. Co.,* (1942) 51 Cal.App.2d 527, 528 [125 P.2d 102].) Our decision would be no different, therefore, if the record were to be completed by adding respondent's objections.

In his petition for a rehearing respondent agrees with us that an inference may be based on an inference, but argues that this is only so when the inference is the only one that can logically be drawn, quoting in support of his argument these words (and others) from *Estate of Wallace,* (1923) 64 Cal.App. 107, 110, 111 [220 P. 682] : ''An inference cannot be said to be established by circumstantial evidence, either in a civil or a criminal case, unless the circumstances relied upon are of such a nature and so related to each other that it is the only inference which can fairly or reasonably be drawn from them. If other inferences may reasonably be drawn from the facts in evidence, the evidence does not support the inference sought to be deduced from it.'' The Supreme Court denied a hearing in the Wallace case, but in doing so disapproved of the statement we have quoted, a fact to which attention was called in *Robertson* v. *Weingart,* (1928) 91 Cal.App. 715, 723 [267 P. 741], in *Strock* v. *Pickwick Stages System,* (1930) 107 Cal.App. 298, 301 [290 P. 482], and in *Lejeune* v. *General Petroleum Corp.,* (1932) 128 Cal.App. 404, 416 [18 P.2d 429]. From *Katenkamp* v. *Union Realty Co.,* (1940) 36 Cal.App.2d 602, 617 [98 P.2d 239] we quote these words (the emphasis is the court's) : ''It is not necessary, in order to establish a theory by circumstantial evidence, that the facts be such and so related to each other that such theory is the *only* conclusion that can fairly or reasonably be drawn therefrom. . . .'' Among the authorities cited is ''opinion of Supreme Court denying a hearing in *Estate of Wallace.* . . .''

The petition to augment the record on appeal is denied; the petition for a rehearing is denied.

Respondent's petition for a hearing by the Supreme Court was denied July 22, 1943. Shenk, J., and Curtis, J., voted for a hearing.