[S. F. No. 18688. In Bank. Feb. 17, 1953.]

ARTHUR RALPH GOODMAN et al., Appellants, v. E. L. HARRIS et al., Defendants; PACIFIC GAS & ELECTRIC COMPANY, Respondent.

Belli, Ashe & Pinney, Melvin M. Belli, Betsy Fitzgerald Rahn and Van H. Pinney for Appellants.

Robert H. Gerdes and Frederick W. Mielke, Jr., for Respondent.

EDMONDS, J.—Arthur Ralph Goodman, Jr., died and Janet McCrum sustained permanent injuries as the result of inhaling carbon monoxide from a butane gas heater in a cabin which they were occupying overnight. Janet and the heirs of Arthur have appealed from a judgment of nonsuit in favor of Pacific Gas and Electric Company, the owner of the property where the accident occurred.

E. L. Harris, the corporation's tenant, and his wife Dorothy were in possession and control of the premises. Mr. and Mrs. Harris, Helen M. Karteus, his mother, and P. G. & E. were sued for damages by Janet and the heirs of Arthur.

According to the complaint, the Harrises "were the lessees in possession who . . . operated and maintained certain tourist cabins, a restaurant and bar" and a garage, which property was owned by P. G. & E. The property and improvements, it was alleged, were leased by P. G. & E. with knowledge that they were to be used "for rental as lodgings by the general public" and that there existed upon the premises "a dangerous and defective condition" in that the "tourist cabins were so negligently constructed, maintained and operated, and the heating appliances thereon were so dangerous and defective as to be dangerous, unsafe and unsuited for the purpose for which they were to be used." The complaint further alleged that Arthur and Janet were "invited to and did rent one of the tourist cabins . . . as a lodging for the night" and that the "defendants so negligently maintained, heated, supervised, constructed, managed and operated" the cabin "that the

gas stove . . . and the premises . . . were defective, dangerous and a peril to human life.'' It was claimed that Arthur died and Janet suffered permanent injuries ''solely by reason of such negligence, and as a proximate consequence thereof.''

The separate demurrers of the defendants were overruled. Later, a motion by P. G. & E. for judgment on the pleadings was denied.

By its answer, P. G. & E. admitted that it owned the real property and that the Harrises were in possession of and managed it. As stated by P. G. & E., the Harrises were not its lessees, but E. L. Harris was its tenant ''holding over on a month-to-month rental under the terms of an agreement of lease for a period of one year.'' It was alleged that, prior to the lease to Harris, the property had been leased to A. M. Hinman, who had assigned his lease to Arthur W. Dahl and Leonard A. Allen with the permission of P. G. & E. Thereafter, Dahl and Allen ''quitclaimed and surrendered'' to P. G. & E. all their right, title and interest in and to the Hinman lease.

P. G. & E. denied that it negligently constructed, maintained and operated the premises and that any injury was caused by its acts. It admitted that Arthur and Janet were asphyxiated by ''operation of an unvented butane gas heater'' in one of the cabins and that Arthur died as a result. An affirmative defense of contributory negligence also was pleaded.

Copies of the two leases of the property were attached to the answer of P. G. & E. and incorporated therein by reference. The first, to Hinman, provided that the lessee had the right to construct improvements ''proper and suitable for residential and recreational purposes'' upon the premises. He could remove any improvements which he erected, with certain exceptions not here material, before the termination of the lease, but any structures not so removed ''shall be deemed to be fixtures constituting a part of said premises and title thereto shall thereupon automatically vest in'' P. G. & E.

The one-year lease to Harris contained a similar provision and provided further that: ''Lessee shall not permit any disorderly conduct or nuisance to exist on said premises.'' P. G. & E. was given the right of entry during the term of the lease ''for the purpose of inspecting'' the premises and determining if Harris was complying with the terms of the lease. Harris promised to keep the buildings in repair and return them to P. G. & E. in good condition at the termination of the lease. It was provided that any holding over after the expiration of

the lease with the consent of P. G. & E. should be considered a tenancy from month to month on the terms and conditions specified in the lease.

The answer of the Harrises and Mrs. Karteus denied all of the material allegations of the complaint and specifically denied that the accident was due to any negligence upon their part. They also interposed the affirmative defense of contributory negligence.

There is virtually no dispute as to the facts. Viewed in the light most favorable to the plaintiffs, with all inconsistencies disregarded and only those inferences favorable to the plaintiffs which reasonably can be drawn from the evidence considered, the evidence may be summarized as follows:

P. G. & E. owned certain real property which it leased to Hinman. Sometime prior to the termination of that lease, improvements were placed upon the property, including three streetcars converted into living and sleeping accommodations. These improvements, not having been removed at the time the lease was terminated, became the property of P. G. & E.

Hinman, with the permission of P. G. & E., assigned his lease to Dahl and Allen, who thereafter purported to sublet the premises to Green. Harris originally took possession of the property from Green under an agreement whereby he purchased Green's stock in trade and operating equipment and rented the premises from him. Thereafter, the Harrises purchased and installed the secondhand gas heater which was defective.

When the heater was purchased, the firebrick provided in its construction by the manufacturer to dispel carbon monoxide gas was missing. No repairs were made to the heater, nor was it ever adjusted for the use of butane gas. It was a type designed to operate without a vent, and there was no way a flue could be attached to it. Harris installed the heater by connecting it to a pipe from a central butane gas tank which supplied the various structures on the premises. This pipe entered the streetcar cabin at an opening in the wall opposite the side of the structure in which a vent had been constructed. The tank and gas for the premises were supplied by the Glenbrook Gas Company of Nevada City. The heater was not fastened down, but "was just sitting there" on the floor. It could be removed simply by detaching the pipe connection.

In response to Green's request for a lease, P. G. & E. sent an employee to the premises to determine whether he was "a proper man to run a decent sort of place." This was

about three months after the heater was installed. P. G. & E. then discovered that Harris was in possession of the premises. The investigator was expected to determine whether the place was "run sloppery, was it a messy looking place or not . . ." and also if the premises were reasonably safe. Harris informed the investigator that he intended to use the property as a garage, motel and restaurant.

P. G. & E. decided to deal directly with Harris. It secured a surrender of the existing lease from Dahl and Allen and entered into a new one-year lease with Harris. At that time, improvements upon the property consisted of a garage, restaurant, house, pump house, water tower, three converted streetcars, and two log cabins. Beside the house and visible from the highway was a large sign reading, "CABINS 2.50 and UP."

The record contains only the most sketchy description of the streetcar cabins. No dimensions are shown, nor is it clear how many windows and doors each contained. Both the windows and an outside door were in proper working order; all opened easily. The windows were "regular streetcar windows," operated by pushing a strap up and permitting the window to drop down. No directions were provided as to the manner of operating them.

Each streetcar apparently was divided into two so-called "cabins" by an open partition across the car. On each side of the partition was a bed, complete with bedding, and a very limited amount of other furniture. It appears that the space on each side of the partition was heated by a single gas heater installed in one of the two rooms. The streetcars never were licensed for use as a motel.

The record shows that employees of P. G. & E., apparently surveyors and other operating personnel, were on and about the premises upon several occasions after the lease with Harris was executed, but there is no evidence of any further attempt by P. G. & E. to inspect the property. Sometime after the expiration of the term of the lease, while Harris was holding over on a month to month tenancy, an inspector for the Department of Industrial Relations, Division of Housing, inspected the premises. He informed the Harrises that the streetcar cabins did not conform to statutory requirements for an auto court. According to him, they were too small and not of the proper structural dimensions, had insufficient window space, and lacked running water with a drain. Because of these defects, he told the Harrises that the streetcar cabins must not be offered for overnight occupancy, but

could be rented on a weekly or monthly basis. Thereafter, they were not rented for one night except to Arthur and Janet at the time of the accident. They were, however, rented by the week or month during the succeeding year and had been occupied by friends of the Harrises upon several occasions.

On the day preceding the accident, Arthur and Janet left about 5 a. m. for a ski trip. They spent the entire day skiing, and were returning home in Arthur's automobile when, about midnight, it broke down near the Harris garage. A heavy snowstorm was then raging. Harris towed the disabled vehicle to his garage and Arthur and Janet took refuge in the adjacent restaurant. There they fell asleep at a table and, after having been requested to move by a group desiring to play cards, again fell asleep at the counter.

Dorothy Harris awakened them and asked if they would like to sleep in a cabin overnight until the automobile could be repaired. Janet refused, explaining that they were not married, and Dorothy offered them adjoining cabins, which they accepted. Dorothy prepared the streetcar cabin for them and lighted the gas heater, turning it on almost all the way. She did not open any windows, and when she left the cabin she closed the door. Returning to the young couple, she directed them to the cabin through the blizzard.

Upon entering the cabin, Janet took off her ski boots and lay down upon the bed, covering herself with blankets. She noticed that the heater was on, but paid no further attention to it. According to her, Arthur tried without success to open a window and commented that "they wouldn't open." He opened the door, but the wind blew it all the way open so he slammed it shut. Janet fell asleep and remembered nothing further until she awoke more than 30 hours later in a hospital. She recalled only a dim sensation of suffocation during the night and a feeling that she wanted to get out into the fresh air.

The next morning, the Harrises found Arthur dead on the bed in one room and Janet unconscious upon the floor in the other one. Both were fully clothed except for shoes. The heater was still burning, the windows and door were closed, and snow was piled against the door. Medical testimony establishes that Janet suffered permanent injury as the result of asphyxiation.

At the conclusion of the plaintiffs' case, all of the defendants moved for a nonsuit. The motions were granted

as to Mrs. Karteus and P. G. & E. Thereupon, the court was advised that the matter had been settled as to the Harrises. The cause was then ordered off calendar and the jury discharged. The appeal is from only the judgment of nonsuit in favor of P. G. & E.

The plaintiffs contend that a landlord who rents property with knowledge that it is to be used for a public or semipublic purpose is liable to third persons injured upon the premises by a defect therein which existed at the time of making or renewing the lease. The questions of the existence of a dangerous condition upon the premises, and its causal relation to the injury, are, they say, ones of fact which should have been left to the determination of the jury.

P. G. & E. does not disagree with the statement of the rule that a landlord is liable for injuries resulting from a defective condition of the premises existing at the time of entering into a lease where the property is to be used for a public purpose. However, it argues that the rule is inapplicable to the facts disclosed by this record. It concedes that a dangerous condition, the defective gas heater, existed upon the premises at the time of making the lease, and that the heater caused the injuries. But the defect, it says, was in the property of the tenant, and not in the premises rented to Harris.

■ "A lessor who leases property for a purpose involving the admission of the public is under a duty to see that it is safe for the purposes intended and to exercise reasonable care to inspect and repair the property before possession is transferred so as to prevent any unreasonable risk of harm to the public who may enter." (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 380 [240 P.2d 580]; *Burroughs* v. *Ben's Auto Park, Inc.*, 27 Cal.2d 449, 453 [164 P.2d 897].) The parties agree that this is the well established rule. The difficulty arises in applying the principle to the facts of this case.

Upon oral argument, for the first time, the plaintiffs contended that whether the defective heater was so affixed to the premises as to have become a part of the realty was a question of fact which should have been submitted to the jury. They based their position in this regard upon *Knell* v. *Morris*, 39 Cal.2d 450, 456 [247 P.2d 352].

In that case, a question arose as to whether "a nine-section, cast-iron, gas-fired water heater" constituted a part of the

premises. The court said: "Whether a water heater is realty or personalty is, of course, a question of fact (citations), and various factors must be considered, such as the manner of its annexation, its adaptability to the purpose for which the realty is used, and the intention of the party making the annexation. (Citation.) As to innocent third parties, the intent which controls is that which is reasonably manifested by physical facts and outward appearances, rather than any express or implied intent of those making the annexation. (Citations.) In the present case it can reasonably be inferred that the heater was attached to the building by means of gas and water pipes, and the evidence, although meager, is sufficient to permit a finding that the heater was permanently affixed to the realty and was adapted to the purpose for which the premises were used."

 Here, there is no evidence from which it reasonably could be inferred that the gas heater was so affixed to the building as to have become a part of the realty. It was a small and easily portable piece of equipment, not fastened down in any manner but "just sitting there" on the floor. It was connected to the gas pipe inlet, but could be detached simply and easily without affecting the premises. The very defect which caused these injuries made it unadaptable to the purpose for which the realty was used. Even if it had been a proper heater, it would not have been "essential to the ordinary and convenient use of the property." (*M. P. Moller, Inc.* v. *Wilson*, 8 Cal.2d 31, 38 [63 P.2d 818].) The ease with which it could be removed and replaced without affecting the physical premises negatived any intent to make it a permanent fixture and part of the realty. Thus, the evidence fails to raise any issue of fact which should have been submitted to the jury.

The plaintiffs concede that, if the heater had not become a part of the realty, it was not the property of P. G. & E. and was not leased by the corporation to Harris. However, they argue that it was a defective condition existing "*on*" the premises at the time the lease was entered into. They also claim that the premises were defective in that the streetcar cabin was not fit for rental as a tourist cabin because it lacked "vents which were connected up with the heaters," adequate space to meet the requirements for sleeping accommodations, and adequate window space for proper ventilation. This combination of defects in the property leased and in a mechanical device belonging to and operated by the lessee, they say,

created a dangerous condition for which P. G. & E. may be held liable.

With every reasonable inference favorable to the plaintiffs drawn from the evidence, there is no basis in the record for the argument that the property of P. G. & E., the streetcar cabin, was itself defective. The cabin did not meet statutory requirements of construction for rental as an overnight accommodation for transients. But the state's inspector told the Harrises that it was permissible to rent the cabin by the week or month. In view of this evidence, it is impossible to draw the inference that it was unsuitable for human occupancy. The cabin did have a vent which could be connected to a heating unit and, despite an unwarranted assertion to the contrary in the briefs of the plaintiffs, there is no indication that the vent was faulty. Nothing in the record supports the assertion that the cabin lacked proper ventilation. It had windows and a door which could be opened easily. From the evidence, it appears that if they had been opened, this tragedy would not have occurred.

Although the point is not raised in the briefs, the District Court of Appeal suggested that the premises were defective because the gas feeder line entered the cabin at a point on the wall opposite the location of the vent. However, there is no showing that the pipe was incapable of extension, or that a vented heater could not have been installed. Nor is there any indication that a proper unvented heater would have been unsafe if installed in the cabin. The point of entry of the gas line, obviously chosen for convenience, is no basis for an inference that, because of its location, a safe heating unit could not have been installed.

The very most which is disclosed by the evidence is the negligent operation of a defective gas heater in a cabin which was otherwise safe and suitable for human habitation. There is no basis in the record for an inference that the heater, although defective, would have caused injury if operated with circumspection in a properly ventilated room. On the contrary, the evidence shows that the heater had been operated in this cabin without incident for a period of several years.

Under the circumstances, liability may be imposed upon P. G. & E. only if it was responsible for a latent dangerous condition of its lessee's property which existed upon the premises at the time of the execution of the lease. Re-

search of counsel and this court has disclosed no decision in any jurisdiction imposing liability for the defective condition of property other than that leased. In every case where, under the rule agreed upon by the parties, a landlord has been found liable, the defect was one existing as a structural part of the property leased. (*Hayes* v. *Richfield Oil Corp.*, *supra*, unguarded grease pit in gasoline service station; *Burroughs* v. *Ben's Auto Park, Inc.*, *supra*, unguarded drop-off from parking lot retaining wall to areaway 12 feet below; *King* v. *New Masonic Temple Assn.*, 51 Cal.App.2d 512 [125 P.2d 559], uneven step from row of seats to floor of auditorium; *Boothby* v. *Town of Yreka City*, 117 Cal.App. 643 [4 P.2d 589], faulty stairway in public building.) In each instance, the defective condition, being a part of the demised premises, was one which the lessor could have repaired and was under a duty to correct.

■ Frequently, situations arise where injury results from activity of the lessee upon premises which, by reason of some defect, are not reasonably suitable for such conduct. When this occurs, the lessor may be held liable, not for the fault of the lessee, but only for his own fault in renting property not safe for the activity to be conducted. A recent example of this type of situation involved liability of the owner of a fairgrounds for injuries suffered by a spectator at a "hot rod" race being conducted by its licensee. (*Gibson* v. *Shelby County Fair Assn.*, 241 Iowa 1349 [44 N.W.2d 362].) The petition alleged that the barriers and guards upon the premises were unsuitable for such purposes and that the plaintiff was injured by a wheel which became detached from one of the racing cars. The appellate court reversed an order sustaining a motion to dismiss the petition. It agreed that the landlord could not be liable for negligence in the operation of the race, but held that the corporation owed a duty to see that the premises were reasonably suited to the activity to be conducted.

In *Larson* v. *Calder's Park Co.*, 54 Utah 325 [180 P. 599, 4 A.L.R. 731], the plaintiff was injured by a bullet from a shooting gallery. The evidence disclosed that the walls of the rented building in which the business was conducted were dilapidated and contained large holes and cracks through which bullets could escape. This condition existed at the time of the lease. The lessor was held liable for the defective condition of the walls which rendered the building

unsafe for the operation of a shooting gallery. Here, again, liability was predicated upon the condition of the property leased, not the fault of the lessee in operating the property.

*Manning* v. *Leavitt Co.*, 90 N.H. 167 [5 A.2d 667], dealt with injuries caused by a mechanical device upon leased premises. The evidence indicated that a permanent wave machine in a beauty parlor was either defective or negligently operated, or both. Except for the fact that it is not shown when the machine was installed upon the premises, the factual situation is substantially identical to that in the present case. ▮ The court stated the rule of liability of the lessor as follows:

"This plaintiff's injuries were not due to any want of care with respect to the condition of the premises. The duty of the invitor-lessor does not extend to matters having to do merely with the lessee's management or operation of premises which would be safe but for such management or operation, at least where the lessee is in sole actual control, as was true in this case. The fact that a fault of the lessee or his servant commonly concurs with the lessor's failure to see to the safety of the premises should not blind us to the basic principle, upon which the invitation cases rest, that the lessor in ordinary circumstances cannot be held for the lessee's fault, but solely for his own." (P. 169.)

The reasoning of the New Hampshire court is equally applicable to the present case. ▮ P. G. & E. had a duty to see that the property which it leased was reasonably safe for the purposes for which it was to be used and the right to repair such defects as it might discover in the premises. But it was under no obligation to inspect property which it did not own and which its lessee intended to use in the operation of his business. Failure to remedy any defect in the appliance was a fault of Harris, not of P. G. & E. ▮ The rule that a lessor must make his property safe for the purposes for which it is to be used cannot be extended to require him to insure against defects in, or negligent operation of, the property of another which may be brought upon his premises for the conduct of the business.

Because the evidence discloses no defect in the leased premises which may have caused or contributed to the injuries which are the basis of this action, the motion for nonsuit was granted properly as to P. G. & E. This conclusion

makes it unnecessary to discuss any of the other contentions of the parties.

The judgment is affirmed.

Gibson, C. J., Shenk, J., Traynor, J., Schauer, J., and Spence, J., concurred.

CARTER, J.—I dissent.

The facts are stated most favorably to the defendant in the majority opinion, but even that statement of the facts of the tragedy, together with the result achieved and set forth there, are sufficient to shock the conscience and sense of justice of any fair-minded person.

This case came to this court on an appeal from a judgment of nonsuit entered in favor of the defendant Pacific Gas and Electric Company. A motion for nonsuit can only be properly granted when, disregarding conflicting evidence and giving to plaintiffs' evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn from that evidence, it can be said that there is no substantial evidence to support a verdict for plaintiffs had such a verdict been rendered. That is the test which should have been applied here.

The crucial question here is whether the heater, admittedly defective, which was installed in the streetcar cabin occupied by the two young people, (one of whom met his death as a result thereof, the young woman receiving permanent and serious injuries as a result of the experience) was a fixture (part of the premises) belonging to the lessor, P. G. & E., or personalty, belonging to the tenant.

It is said in the majority opinion that "there is no evidence from which it could reasonably be inferred that the gas heater was so affixed to the building as to have become a part of the realty. It was a small and easily portable piece of equipment, not fastened down in any manner but 'just sitting there' on the floor. It was *connected to the gas pipe inlet,* but could be detached simply and easily without affecting the premises. The very defect which caused these injuries made it unadaptable to the purpose for which the realty was used. Even if it had been a proper heater, *it would not have been 'essential to the ordinary and convenient use of the property.'* (*M. P. Moller, Inc.* v. *Wilson,* 8 Cal.2d 31, 38 [63 P.2d 818].) The ease with which it could be removed and replaced without affecting the physical premises negatived any intent to make

it a permanent fixture and part of the realty. Thus, the evidence fails to raise any issue of fact which should have been submitted to the jury." (Emphasis added.)

With the above statement, I most emphatically disagree. This court has again paid lip-service to established rules and then proceeded to refuse to apply the rules to the situation at hand. It is admitted that P. G. & E. had a duty to see that the property which it leased was reasonably safe for the purposes for which it was to be used and the right to repair such defects as it might discover in the premises; that "A lessor who leases property for a purpose involving the admission of the public is under a duty to see that it is safe for the purposes intended and to exercise reasonable care to inspect and repair the property before possession is transferred so as to prevent any unreasonable risk of harm to the public who may enter" (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 380 [240 P.2d 580] ; *Burroughs* v. *Ben's Auto Park, Inc.*, 27 Cal.2d 449, 453 [164 P.2d 897]). The only way this court could find to side-step these rules was to hold that there was no evidence from which it could be inferred that the gas heater was so affixed to the building as to have become part of the realty. This statement ignores the recent case of *Knell* v. *Morris*, 39 Cal.2d 450 [247 P.2d 352].

In the Knell case, *supra*, it was said that "Whether a water heater is realty or personalty is, of course, *a question of fact* (see *M. P. Moller, Inc.* v. *Wilson*, 8 Cal.2d 31, 38 [63 P.2d 818] ; 22 Am.Jur. 772-773), and various factors must be considered, such as the manner of its annexation, its adaptability to the purpose for which the realty is used, and the intention of the party making the annexation. (See *Simms* v. *County of Los Angeles*, 35 Cal.2d 303, 309 [217 P.2d 936].) *As to innocent third parties, the intent which controls is that which is reasonably manifested by physical facts and outward appearances, rather than any express or implied intent of those making the annexation.* (See *Simms* v. *County of Los Angeles*, 35 Cal.2d 303, 309 [217 P.2d 936] ; *Trabue Pittman Corp.* v. *County of Los Angeles*, 29 Cal.2d 385, 397 [175 P.2d 512] ; *M. P. Moller, Inc.* v. *Wilson*, 8 Cal.2d 31, 37-38 [63 P.2d 818] ; *People* v. *Church*, 57 Cal.App.2d Supp. 1032, 1048 [136 P.2d 139].) In the present case it can reasonably be inferred that the heater was attached to the building by means of gas and water pipes, and the evidence, although meager, is sufficient to permit a finding that the heater was permanently affixed to the realty and was adapted to the purpose for which the

premises were used. (*Cf. Broadway Imp. & Inv. Co.* v. *Tumansky*, 2 Cal.2d 465, 468-469 [41 P.2d 553].)'' (Emphasis added.) All seven members of this court concurred in that opinion. Five months later, a majority of this court now agree that there is no evidence from which it could possibly be inferred that the heater here was affixed to the realty.

''No evidence''? In reviewing a judgment of nonsuit we are supposed to state the facts most favorably to plaintiff and to draw all reasonable inferences therefrom in his favor (*Knell* v. *Morris, supra*, 39 Cal.2d 450).

The cabin was one presumably intended for use by members of the public; it was located in the high Sierra; it was open on February 3rd (the time of the death and injury) during the skiing season which, in itself, allows the inference that the weather was inclement, to say the least; the windows of the cabin were not opened by Mrs. Harris, and *could not be opened* by the deceased; the door was so arranged that when opened, it was blown wide open by the blizzard; the heater in the cabin was admittedly defective and *was connected to the gas pipe inlet*. From this evidence alone, it is certainly reasonable to infer that a cabin located in the mountains and apparently available for use by the public during the winter season must have some means by which it could be heated; that the heater was to be used for that purpose; that its presence there would be considered by an innocent third person, if he gave the matter a second thought, as much a part of the premises as the walls of the building. From the fact that plaintiff's decedent, an apparently healthy young man (inferable from the fact that he had been on a skiing trip) *could* not open the windows, it may easily be inferred that the windows were difficult to open. To say, as it is said in the majority opinion, that ''Even if it had been a proper heater, it would not have been ''essential to the ordinary and convenient use of the property' '' is so ridiculous, when applied to this case, that it justifies the appellation of Mr. Bumble in Dickens' Oliver Twist that ''the law is a ass, a idiot.'' It completely ignores the practicalities of trying to stay in a cabin, without heating facilities, in zero and sub-zero weather.

Rather than drawing inferences and stating facts favorable to the plaintiffs, as we are required to do, the majority of this court goes to great lengths to draw unfavorable inferences and state facts unfavorable to plaintiffs. It is said that the heater was easily removable, that it was ''just sitting there'' on the floor; that it was unadaptable to the purpose for which

the realty was to be used because of the "very defect which caused these injuries." *Of course,* an innocent third person would at once be aware of the defects in the heater, and say to himself that "this heater is not part of the realty" before putting himself to bed. It is also inferred that even a "proper heater" would not have been essential to the ordinary and convenient use of the property! It is stated in the majority opinion that "Nothing in the record supports the assertion that the cabin lacked proper ventilation. It had windows and a door which could be opened easily." "Nothing in the record" is an erroneous statement. The record shows that an inspector for the Department of Industrial Relations, Division of Housing, inspected the premises and that one of the reasons this cabin could not be used for motel purposes was that there was inadequate window space for proper ventilation. The record also shows that the windows could *not* be opened easily.

In *M. P. Moller, Inc.* v. *Wilson,* 8 Cal.2d 31 [63 P.2d 818], the court said that "Whether under the circumstances of each case the property has lost its character as personalty and has become a fixture is primarily a question of fact to be determined by the evidence." In *Simms* v. *County of Los Angeles,* 35 Cal.2d 303, 309 [217 P.2d 936] it was said "It is settled that three tests must be applied 'in determining whether or not an article is a fixture—namely: (1) the manner of its annexation; (2) the adaptability to the use and purpose for which the realty is used; and (3) the intention of the party making the annexation.' (*San Diego T. & S. Bank* v. *San Diego County,* 16 Cal.2d 142, 149 [105 P.2d 94, 133 A.L.R. 416].) It is also settled that for tax purposes the 'intention' must be determined by the physical facts or reasonably manifested outward appearances without regard to the annexor's status as landlord or tenant." In *Trabue Pittman Corp.* v. *County of Los Angeles,* 29 Cal.2d 385, 393 [175 P.2d 512], it was said "Section 660 of the Civil Code defines 'fixtures' as things that are permanently resting upon or attached to the land or building, but the fact that a trade fixture is removable under Civil Code, section 1019, does not, as plaintiff contends, necessarily negative such element of permanence. We have already indicated that for the most part assessors must be allowed to act on the basis of outward appearances. Moreover, in distinguishing permanence from transitoriness it is not necessary to identify it with perpetuity. (*Southern Cal. Tel. Co.* v. *State Board of Equalization, supra,* 12 Cal.2d 127, 136 [82 P.2d 422].) 'It appears to be sufficient that it [the article

annexed] is intended to remain where placed as long as the land or building to which it is annexed may be used for the same purpose.' (36 C.J.S., Fixtures, § 2, p. 900.) 'It is sufficient if the article shall appear to be intended to remain where fastened until worn out, until the purpose to which the realty is devoted has been accomplished or until the article is super- seded by another article more suitable for the purpose.' (*San Diego Trust & Sav. Bank* v. *County of San Diego, supra,* 16 Cal.2d 142, 151; 26 C.J. 657.)''

The question of whether or not an appliance attached to realty is a fixture or personalty is always a question of fact unless the evidence is undisputed and is susceptible only of one inference (*San Diego Trust & Sav. Bank* v. *County of San Diego,* 16 Cal.2d 142 [105 P.2d 94, 133 A.L.R. 416]).

Applying the three tests set forth in the Simms case, *supra,* it is at once apparent that the evidence was more than suffi- cient to permit submission of the question of whether or not the heater in question was a fixture or personalty to the jury. The heater here was physically annexed to the realty by a gas pipe inlet. Its adaptability to the use and purpose for which the realty was used is apparent. It was the only heater available to produce warmth in a cabin located in the moun- tains where zero and sub-zero weather prevailed during the wintertime which was when this tragedy occurred. The in- tention of the party making the annexation must be determined by that which is reasonably manifested by physical facts and outward appearances ''rather than any express or implied in- tent of those making the annexation'' (*Knell* v. *Morris, supra,* 39 Cal.2d 450). Certainly the article here involved appeared to be intended to remain where it was fastened until it was worn out, or until the purpose to which the realty was devoted had been accomplished or until the article was superseded by another article more suitable for the purpose (*San Diego Trust & Sav. Bank* v. *County of San Diego, supra,* 16 Cal.2d 142).

I would reverse the judgment.

Appellants' petition for a rehearing was denied March 16, 1953. Carter, J., was of the opinion that the petition should be granted.