[Civ. No. 20716. Second Dist., Div. Three. Aug. 25, 1955.]

Estate of ELEANOR M. BOULD, Deceased. PATRICIA A. HUBBARD, Appellant, v. OSCAR DaBELL et al., Respondents.

Morrison, Simon & McKinsey and T. W. McKinsey for Appellant.

Dally & Saulque and Henry E. Dally for Respondents.

ASHBURN, J. pro tem.*—As the result of a will contest the trial judge, after a nonjury trial, denied probate of decedent's will of August 15, 1952, upon the ground that it was the product of undue influence exercised upon the testatrix, Eleanor M. Bould, by proponent Patricia A. Hubbard, who has taken this appeal. The testatrix had no relatives except a brother, Albert DaBell, and a niece, Ellen F. Werger, who contested the will and are respondents herein. The contest was based upon a claim of mental incompetence as well as undue influence, but the court found that Mrs. Bould was competent to make the will. Appellant attacks the judgment denying probate upon the ground of insufficiency of the evidence to sustain the finding of undue influence. Consideration of the evidence and the applicable law discloses that appellant's claim is well founded.

The rule which must guide us in considering the evidence is stated in *Estate of Teel,* 25 Cal.2d 520, 526-527 [154 P.2d 384]: " 'The rules of evidence, the weight to be accorded to the evidence, and the province of a reviewing court, are the same in a will contest as in any other civil case. . . . The rule as to our province is: "In reviewing the evidence . . . all conflicts must be resolved in favor of

*Assigned by Chairman of Judicial Council.

the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. ■ It is an elementary . . . principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. ■ When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court.'' (Italics added.) . . . The rule quoted is as applicable in reviewing the findings of a judge as it is when considering a jury's verdict. . . .' . . .

■ ''Of course, all of the evidence must be examined, but it is not weighed. All of the evidence most favorable to the respondent must be accepted as true, and that unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed.''

The primary basis of the ruling is found in the judge's observation that ''the proponent has shown herself so unreliable as a witness, and so willing to testify to any fact that she believes will help her cause, that I place no reliance upon her testimony . . . I place no reliance upon any of her testimony except where it is thoroughly corroborated by other evidence.'' ■ It was the judge's prerogative to reject proponent's testimony if found unworthy of belief and the record shows that he was justified in reaching that conclusion. Elsewhere in his ''memorandum opinion'' the judge accepts as fact statements of proponent which are in the nature of admissions; and again he exercises a proper judicial function. But the effect of the rejection of testimony is not to be ignored.

■ Disbelief does not create affirmative evidence to the contrary of that which is discarded. ''The fact that a jury may disbelieve the testimony of a witness who testifies to the negative of an issue does not of itself furnish any evidence in support of the affirmative of that issue, and does not warrant a finding in the affirmative thereof unless there is other evidence in the case to support such affirmative.'' (*Marovich* v. *Central Calif. Traction Co.*, 191 Cal. 295, 304 [216 P. 595].) To this same effect are *Edwards* v. *Freeman*, 34 Cal.2d 589, 593 [212 P.2d 883] ; *Moore* v. *Chesapeake & Ohio Ry. Co.*, 340 U.S. 573, 576 [71 S.Ct. 428, 95 L.Ed. 547] ; *Bunt* v.

*Sierra Butte Gold Min. Co.,* 138 U.S. 483, 485 [11 S.Ct. 464, 34 L.Ed. 1031]. And of course the rule is equally applicable to will contests. In *Estate of Anderson,* 185 Cal. 700, 704 [198 P. 407] it is said: "The sole witness as to the immediate circumstances under which the will was executed was the aunt, who was called for the purpose of testifying upon the point by the contestant himself. He is, of course, not bound by her testimony (Code Civ. Proc., § 2049), and the jury was at liberty to reject any of it that did not seem to them worthy of belief, but rejecting it, there is no evidence to take its place and, as was said of a similar case in *Estate of Kilborn,* 162 Cal. 4 [120 P. 762], the case is without evidence upon the point." In *Estate of Kilborn,* 162 Cal. 4, 13 [120 P. 762] : "It is urged by the respondent that Gould, as a witness, was impeached to such an extent as to authorize the jury to disregard his testimony altogether. But the result of this was, at most, to leave the jury without any evidence, one way or the other, on the question of influence or pressure exerted on the testatrix at the time of the making of the will." See also *Estate of Thompson,* 200 Cal. 410, 416 [253 P. 697] ; 26 Cal.Jur. § 76, p. 727. ▌ The fact that one testifies falsely may, and usually does, afford an inference that he or she is concealing the truth but it does not reveal the truth itself or warrant an inference that the truth is the direct converse of the rejected testimony. Speaking of the adverse inference arising from failure to produce evidence or to testify, 20 American Jurisprudence section 193, page 195, says: "The only inference that may be drawn is that the testimony if given would not have been favorable to the party who did not produce the evidence. Evidence of such conduct is persuasive rather than probative and cannot be invoked as substantive proof of any facts essential to the case of the opponent. The rule has been stated that the presumption will not supply a missing link in an adversary's case and cannot be treated as independent evidence of a fact otherwise unproved." Concerning spoliation of evidence, section 185, at page 191, says: "Moreover, while the spoliation of evidence raises a presumption against the person guilty of such act, yet such presumption does not relieve the other party from introducing evidence tending affirmatively to prove his case, in so far as he has the burden of proof." Like considerations apply to the giving of false testimony.

When Mrs. Hubbard's testimony is discarded the evidence consists mainly of that of Mr. Ward Johnson, Long Beach

attorney who drew the will, and his secretary Thelma Myers. However, there are certain undisputed facts (and facts deducible from appellant's testimony without dissent from counsel for either side) which antedate Mr. Johnson's participation in Mrs. Bould's affairs. She had been seriously injured in an accident in late January 1952 and was brought from the hospital to the Hubbard home on February 11, 1952, where she was to remain until recovery from her injury, a fractured knee, there to receive room and board and nursing care from Mrs. Hubbard, who had had training as a nurse and was to receive $225 per month as compensation. Mrs. Bould remained there until her death on March 6, 1953. She received good care, was kept clean, was well fed, and happy with her surroundings, with the attention she had, the cleanliness and the abundant food. Her brother and niece were not dependent on her or she on them. Both of them lived in the State of New York; she had not seen the brother since 1927, and the niece only once since that year; she had a visit from the niece in 1951. Mrs. Bould expressed affection for these relatives and corresponded with them. Appellant and Mrs. Bould developed an affectionate relationship which is conceded to have been one of confidence at the time of execution of the will of August 15, 1952, the one under discussion.

An earlier will was made in April, 1952. When the matter of making that will arose Mrs. Hubbard contacted Attorney Gus Jaffe (now deceased), he and his wife being friends of hers. He called on Mrs. Bould, conferred with her in the absence of appellant, prepared and brought her a will which she executed on April 4, 1952; it was witnessed by Mr. and Mrs. Jaffe. This will left the entire estate to contestants with the exception of three small legacies. Mrs. Hubbard was not mentioned in it and did not know its contents.

On August 7th appellant, at request of Mrs. Bould, again summoned Mr. Jaffe, who called, conferred with her and drew a codicil, which she executed on August 8, 1952. It revoked two minor bequests and, with the exception of a small gift to Mrs. Nellie Swem, of Long Beach, left all the estate to the contestants, the brother and niece. Appellant testified that she gave Mr. Jaffe the information for this codicil and respondent's counsel seem to accept that as correct. It is evident that she thus knew on August 8th that she was not a beneficiary of the will.

It appears that Mrs. Hubbard was caring for several aged

persons in her home, but without a license so to do. On May 7, 1952, she made application to the State Public Welfare Commission for such a license. Investigation was made, followed by denial of the application through letter of August 7, 1952, which the court justifiably found to have been received on or about August 8th, the day of execution of the codicil above mentioned. That letter advised of refusal of a license and that all aged persons must leave the Hubbard home by August 31st. Mrs. Hubbard's testimony warrants the inference that she discussed it with Mrs. Bould and that would be the normal thing to do. Following this letter a plan was disclosed for Mrs. Bould to adopt Mrs. Hubbard, thus making her sole heir. Appellant says that Mrs. Bould suggested it first and on August 8th, but the court found upon sufficient evidence that the plan was conceived by appellant. It was one of adoption, not the making of a will. Both parties agreed to it and the services of an attorney were sought. Mr. Jaffe was not contacted for some reason which does not appear, for appellant's explanation of a previous disagreement between Jaffe and Mrs. Bould was rejected by the court. Mr. Ward Johnson was telephoned by Mrs. Hubbard. At this point we adopt the testimony of Mr. Johnson and Mrs. Myers because of the court's rejection of that of appellant.

Johnson was a stranger to both women. Mrs. Hubbard told him she had a lady living with her who wanted to adopt her and asked if that could be done. No mention was made of a will. Johnson said he should talk with them and agreed to call. When he arrived he talked with Mrs. Bould and appellant was present most of the time. Mrs. Bould told him she wanted to adopt Mrs. Hubbard as her child. "She said she wanted somebody that she knew would take care of her the rest of her life, and so then I asked her if she had a husband. She said, no, he was deceased. I asked her if she had any children. She said, no, she had no children. I asked her what relatives she had. She said that she had a brother, Oscar DaBell, back some place in New York. I made a note of it at the time and she had no other brothers or sisters. I asked her what property she had. She said she had this property, her home." She said her brother was confined to a hospital in New York and that she had not seen him for many years. She gave the attorney considerable more information about her property and its income, and, with appellant's help, about her bank account. "I asked her

why she wanted to adopt Mrs. Hubbard and she said, 'Well, I can't look after my property. . . .' She said, 'I need somebody to look after my property, and I want to know that I am going to be cared for the rest of my life.' I said, 'Well, do you like it here?' She said, 'Yes, I like Pat very much. I love her very much. I like to stay with her.' I said, 'Well, my advice to you is to have Mrs. Hubbard appointed as your guardian, and then if you want her to have your property when you pass away, or whatever is left, you can make a will leaving it to her. That was the first time a will was mentioned by anybody. I suggested it to Mrs. Bould. Then I said, 'If you and Mrs. Hubbard don't get along, if she passes away and you change your mind, you can change your will later on and give it to somebody else.' I said, 'I think that would be much better than adopting her as your child.' She said, 'Well, all right. Let's do that, then.' '' In another part of the Johnson testimony the matter is phrased as follows: ''I asked her who her doctor was and I asked her what she wanted done with her property. She said, 'I want to leave my property, whatever I have when I pass on, to whoever takes care of me.' She said, 'I am worried about someone to take care of me.' I said, 'Are you being well cared for here?' And she said, 'Yes, I love Mrs. Hubbard. I am well cared for and I like it here.' I said, 'If you want to leave to the person who takes care of you what is left you should make a Will.' And she said, 'That is what I want to do. I want to leave Mrs. Hubbard whatever I have when I die; whatever is left.' That was the occasion for drawing the Petition for Guardianship and the Will.'' Mr. Johnson waited until Mr. Hubbard came home and then one of the three told him that Mrs. Bould wanted to appoint his wife as her guardian and asked what he thought; he said that is all right if she wants to do it. So she gave her assent. There was no mention at any time of Mr. Jaffe or any former will. Mrs. Bould was clean, fresh, a very alert little old lady and seemed happy. This was on August 13th or 14th.

On the 15th Mr. Johnson brought the will he had prepared and a petition for appointment of guardian. His secretary, Mrs. Myers, was with him. Mrs. Hubbard admitted them and conducted them to Mrs. Bould in the bedroom. She was ''smiling and seemingly very happy and very keen and very alert.'' Johnson said he had brought the petition for letters of guardianship ''and also your will as we talked when I was here before.'' Mrs. Hubbard was then present. The

petition was read to Mrs. Bould and she and appellant signed it. Then Mr. Johnson asked Mrs. Hubbard to leave the room and she did so. He did not know where she went. This left only the testatrix, the attorney and his secretary in the room. He then gave Mrs. Bould the original or a copy of the will and read it slowly to her as she followed it. She said, when asked, that it was her will; that it was made the way she wanted it; and that no one had influenced her in making it; that she wanted Johnson and Mrs. Myers to witness it. Thereupon the document was executed in the usual manner and Mr. Johnson took the original with him, leaving a copy. The guardianship was carried through in due course.

Though the attorney saw Mrs. Bould several times later about her accident, there was no further mention of the will at any time. Testatrix lived some seven months after this will was made and, so far as appears, made no mention of the will to anybody. She continued to be happy with her surroundings, the cleanliness and the attention and food given her, according to Mrs. Barnes, a neighbor, called by contestants. Mrs. Hubbard denied that she influenced the making of the will in her favor and also denied that she knew of its execution at any time before Mrs. Bould's death. The foregoing résumé leaves contestants without any direct evidence of undue influence and relegates them to a circumstantial showing, which is the ground upon which they really stand.

It is well to have in mind the exact thing that contestants would thus establish by indirect evidence. *Estate of Hamburger,* 126 Cal.App. 455, 464 [14 P.2d 802]: " 'Proof, to establish undue influence, must be had of a pressure which overpowers the mind and bears down the volition of the testator at the time the will is made. It consists in the exercise of acts or conduct by which the mind of testator is subjugated to the will of the person operating upon it (*Estate of Holloway,* 195 Cal. 711 [235 P. 1012]; *Estate of Anderson,* 185 Cal. 700 [198 P. 407]). Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence in the absence of testimony showing that there was a pressure operating directly on the testamentary act and to such an extent as to affect the terms of the testament. (*Estate of Fleming,* 199 Cal. 750 [251 P. 637]; *Estate of Bryson,* 191 Cal. 521 [217 P. 525].)' " *Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512]: "In *Estate of Arnold,* 16 Cal.2d 573, at page 577 [107 P.2d 25],

the rules governing the determination of whether a testamentary instrument is the product of undue influence are stated as follows: 'In an action to set aside a will of a deceased person on the ground of undue influence, it is necessary to show that the influence was such as, in effect, to destroy the testator's free agency and substitute for his own another person's will. (*Estate of Motz*, 136 Cal. 558, 583 [69 P. 294].) Evidence must be produced that pressure was brought to bear directly upon the testamentary act. (*In re McDevitt*, 95 Cal. 17, 33 [30 P. 101].) ▮▮▮ Mere general influence, however strong and controlling, not brought to bear upon the testamentary act, is not enough; it must be influence used directly to procure the will and must amount to *coercion* destroying free agency on the part of the testator. (*Estate of Keegan*, 139 Cal. 123, 127 [72 P. 828].) . . . mere opportunity to influence the mind of the testator, even coupled with an interest or a motive to do so, is not sufficient. (*Estate of Easton*, 140 Cal.App. 367, 371 [35 P.2d 614].)''

▮▮▮ And circumstantial evidence is sufficient only when it is inconsistent with the absence of undue influence. *Estate of Hamburger, supra*, 126 Cal.App. 455, at page 464 [14 P.2d 802], says in this regard: '' 'It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but, before a will can be overthrown, the circumstances proved must be inconsistent with voluntary action on the part of the testator. (*Estate of Morcel*, 162 Cal. 188 [121 P. 733].)' (*Estate of Donovan*, 114 Cal.App. 228 [299 P. 816].) See also *Estate of Presho*, 196 Cal. 639 [238 P. 944], and *Estate of McDevitt*, 95 Cal. 17 [30 P. 101].)'' And *Estate of Welch, supra*, 43 Cal.2d 173 at page 178: ''It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence; but before the will can be overthrown the circumstances must be *inconsistent* with voluntary action on the part of the testator. (*Estate of Donovan*, 114 Cal.App. 228, 233 [299 P. 816].)'' This is a well established rule, stated in numerous cases, e. g. *Estate of Doty*, 89 Cal.App.2d 747, 755 [201 P.2d 823]; *Estate of Carson*, 74 Cal.App. 48, 61 [239 P. 364]; *Estate of McGivern*, 74 Cal.App.2d 150, 156 [168 P.2d 232]; *Estate of Hull*, 63 Cal.App.2d 135, 143 [146 P.2d 242]; *Estate of Lombardi*, 128 Cal.App.2d 606, 612 [276 P.2d 67]. ▮▮▮ In the Doty case this court pointed out, at page 755, that: ''Proof of conduct which merely inspires affection and gratitude, standing alone, does

not even tend to prove undue influence. If it results in recognition by a testamentary act it is regarded as a natural and proper result. If the acts themselves are not [to] be condemned, the fact that they are inspired by a selfish motive does not give them legal significance.''

In urging a circumstantial sufficiency of evidence counsel for respondents properly draw upon testimony and conduct of proponent which is adverse to her interests. She testified that prior to the making of the April 4th will Mrs. Bould had given her a holographic one which said ''In case of my death everything goes to who takes care of me,'' or, as elsewhere phrased, ''In case of my death, who takes care of me at that time gets everything I have.'' On March 28th appellant asked one Bryant, a notary public, if such a will was good. He advised her to get a lawyer. This was followed by employment of Jaffe and making of the will of April 4th, the provisions of which were unknown to Mrs. Hubbard. Affectionate relations had been established between her and Mrs. Bould before that time, but the brother, who was physically helpless because of amputation of both legs, and the niece were given substantially all of the property. Testatrix was fond of them. On August 8th she made a codicil which left everything to these relatives. About seven days later she cut them off entirely, leaving all her property to proponent. Mr. Jaffe had handled the April will and the August codicil. But he was not consulted about the new will and the reason for the change was not satisfactorily explained by proponent. Counsel substitute for her rejected testimony an inference that she did not want him to know about her plan for adoption and becoming sole heir. And it was her plan. She voiced it on July 25, 1952 to Marjorie Rhue Skinner, investigator for the Public Welfare Commission, saying that Mr. Jaffe was going to make out adoption papers so that Mrs. Bould could adopt her, that she expected this to be completed immediately so she could be sole heir of Mrs. Bould and also be able to take care of her without a license. For some reason she contacted Mr. Johnson rather than Mr. Jaffe a few days after her license had been denied. The talk on the telephone and on his first visit to the house was about adoption and no mention of a will was made until he suggested one. Respondents' brief says: ''It is evidently true that in choosing counsel to act for the decedent the appellant did not have in mind the will, but she certainly

beyond question did have in mind becoming decedent's sole heir.''

It has been suggested that Mrs. Hubbard used the letter of August 7th as basis for threats which induced decedent's acquiescence in the adoption plan. But there is no foundation for such an inference. All the record shows is that the matter had been discussed and agreed upon before Mr. Johnson was telephoned about it. The letter itself was calculated to disturb Mrs. Bould, who was 76 years of age and physically helpless, dependent on others for care, and well satisfied with what she had been receiving. Her brother and niece were not in a position to care for her so far as appears. Any plan that would enable her to pursue her established way of life would naturally appeal to her. ▮ And if she saw fit, directly or indirectly, to leave her property to the Hubbards in exchange for and as an inducement to continued comfort and care, it is not for courts or juries to say that her relatives had a claim superior to her own desires in the matter. ''It was for [her], not for the court, to be satisfied with the reasons upon which [she] acted and to determine whether the terms of the will were just and fair.'' (*Estate of Hilker*, 85 Cal.App.2d 680, 685 [194 P.2d 132].) ▮ Moreover, '' 'Influence gained by kindness and affection will not be regarded as "undue" if no imposition or fraud be practiced, even though it induce the testator to make . . . an unjust disposition of his property in favor of those who have contributed to his comfort and ministered to his wants, if such disposition is voluntarily made. *Matter of Gleespin's Will*, 26 N.J.Eq. 523.' (*Mackall* v. *Mackall*, 135 U.S. 167 [10 S.Ct. 705, 34 L.Ed. 84].)'' (*Kelly* v. *McCarthy,* 6 Cal.2d 347, 364 [57 P.2d 118].) It does not appear that appellant took any part at all in the discussion or execution of the will.

There are numerous suspicious circumstances which emphasize the evasiveness and contradictions and untruths found in appellant's testimony. The will itself carries one, in that it makes Mr. Hubbard contingent legatee of the entire estate and there is no evidence to suggest that he himself had given substantial care to testatrix or that she had affection for him or expected him to care for her in the event of his wife's demise. Mrs. Hubbard made no agreement to care for testatrix during the rest of her life, and continued to collect the $225 a month until Mrs. Bould died. Mrs. Bould was in such condition physically and nervously that she would readily be susceptible to undue pressure. On the day of the

will appellant stated in the guardianship petition that Mrs. Bould "by reason of physical and mental weakness" was unable to care for herself or her property "and by reason thereof is likely to be deceived or imposed upon by artful or designing persons." It is a reasonable deduction from the evidence that appellant had both motive and desire to obtain Mrs. Bould's property when she was gone. And she had ample opportunity to impose her will upon the elderly woman. But "It is the settled rule that: 'Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on the testamentary act. (*Estate of Langford,* 108 Cal. 608 [41 P. 701]; *Estate of Carithers,* 156 Cal. 422 [105 P. 127].)' *Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]." (*Estate of McGivern, supra,* 74 Cal.App.2d 150, 156.) This is a settled rule. See *Estate of Lingenfelter,* 38 Cal.2d 571, 586 [241 P.2d 990]; *Estate of Welch,* 43 Cal.2d 173, 175 [272 P.2d 512]; *Estate of Lombardi,* 128 Cal.App.2d 606, 611 [276 P.2d 67].

 Respondents' counsel emphasize the facts that testatrix was physically unable to care for herself, under the care of a physician continuously, in bed most of the time, was highly nervous, afraid she would lose the care of Mrs. Hubbard, in such condition that she was susceptible to undue pressure, that appellant had the interest, motive and desire to succeed to all her property, that she conceived the adoption plan with that objective in mind, as well as prolonging the $225 a month, that she first learned she was not the beneficiary of Mrs. Bould's will on August 8th, that this quickened her desire and her activities, that she obtained the services of a new and strange attorney, that his suggestion of a guardianship and a will fitted into her existing objective, that the will when made left everything to her or her husband to the exclusion of her own relatives of whom she was fond, and that proponent on the witness stand was evasive, contradictory and without regard for the truth. But, in the absence of activity in procuring the will all of the foregoing suspicious circumstances count for naught in the law of undue influence. What amounts to "activity" in this field of the law will be presently considered. Suffice it to say, at this point, that the circumstantial evidence is not sufficient to make a case of undue influence because it is not inconsistent with voluntary

action of the testatrix. It is not sufficient unless the burden of proof was shifted to defendant to prove the absence of such malign influence. Respondents' counsel argue that this burden did rest upon proponent and that she failed to sustain it. We find ourselves unable to agree.

The necessary basis for the shifting of the burden is set forth in *Estate of Lingenfelter, supra,* 38 Cal.2d 571, 585: "The indicia of undue influence have been stated as follows: '(1) The provisions of the will were unnatural. . . . (2) the dispositions of the will were at variance with the intentions of the decedent, expressed both before and after its execution; (3) the relations existing between the chief beneficiaries and the decedent afforded to the former an opportunity to control the testamentary act; (4) the decedent's mental and physical condition was such as to permit a subversion of his freedom of will; and (5) the chief beneficiaries under the will were active in procuring the instrument to be executed.' (*Estate of Yale,* 214 Cal. 115, 122 [4 P.2d 153].) These, coupled with a confidential relationship between at least one of the chief beneficiaries and the testator, altogether were held 'sufficient to shift the burden to the proponents of the will to establish an absence of undue influence and coercion and to require the issues to be determined by the jury.' (*Estate of Yale, supra,* p. 123.)'' The trial court found all these factors to be present. And it may be conceded that the proof supports these findings in all respects but one,—activity on the part of the beneficiary.

The mere existence of a confidential relationship coupled with opportunity to impose the beneficiary's will upon the testatrix is not enough to shift the burden of proof. "As suggested in *Estate of Higgins,* 156 Cal. 257 [104 P. 6], a 'presumption of undue influence' arises from proof of the existence of a confidential relation between the testator and such a beneficiary, '*coupled with activity on the part of the latter in the preparation of the will.*' The confidential relation alone is not sufficient. There must be activity on the part of the beneficiary in the matter of the preparation of the will.'' (*Estate of Baird,* 176 Cal. 381, 384 [168 P. 561].) "Undoubtedly the relation between respondent and his mother was affectionate and confidential and that (*sic*) he would have a general influence over his mother proceeding from such relation. But the existence of such relation and this general influence raises no presumption that undue advantage was taken of it by respondent. There is no legal suspicion of

undue influence arising from the existence of such a relation-ship, which imposes upon the son the necessity, when a will in his favor is attacked, of assuming the burden of proof that he had not unduly influenced his mother in making the will.'' (*Estate of Anderson,* 185 Cal. 700, 716, 717 [198 P. 407].) See to the same effect *Estate of Kilborn,* 162 Cal. 4, 11 [120 P. 762]; *Estate of Ricks,* 160 Cal. 450, 461 [117 P. 532]; *Estate of Doty,* 89 Cal.App.2d 747, 758 [201 P.2d 823]. And, as shown above, the addition of interest and motive to subvert the testatrix' will does not change the burden; activity on the part of the one occupying the confidential role is requisite.

 That activity must be in the preparation of the will. *Estate of Lombardi,* 128 Cal.App.2d 606, 612 [276 P.2d 67], quotes *Estate of Burns,* 26 Cal.App.2d 741 [80 P.2d 77], as follows: '' '. . . where one who unduly profits by the will as a beneficiary thereunder sustains a confidential relation to the testator, *and has actually participated in procuring the execution of the will,* the burden is on him to show that the will was not induced by coercion or fraud. . . . However, the confidential relation alone is not sufficient. *There must be activity on the part of the beneficiary in the matter of the preparation of the will.*' '' Some incidental activity in the execution, rather than the preparation of the will, is not enough to swing the burden. The Lingenfelter opinion, *supra,* at page 586 says: ''Active participation in procuring the execution of the will cannot be inferred from the fact that Madge accompanied Vivian [the testatrix] to Powell's office, in the absence of any indication that Vivian went there at Madge's instigation or request, or that Vivian was not acting entirely in accord with her own desire.'' It has been held that the mere fact of the beneficiary procuring an attorney to prepare the will is not sufficient ''activity'' to bring the presumption into play (*Estate of Llewellyn,* 83 Cal.App.2d 534, 565 [189 P.2d 822, 191 P.2d 419]; *Estate of Hull,* 63 Cal.App.2d 135, 139, 142 [146 P.2d 242]; *Estate of Williams,* 99 Cal.App.2d 302, 315 [221 P.2d 714]); or selection of attorney and accompanying testator to his office (*Estate of Latour,* 140 Cal. 414, 424 [73 P. 1070, 74 P. 441]; *Estate of Anderson,* 185 Cal. 700, 717 [198 P. 407]); or mere presence in the attorney's outer office (*Estate of Lingenfelter, supra,* 38 Cal.2d 571, 586 [241 P.2d 990]; *Estate of Anderson, supra,* 185 Cal. 700, 717); or presence at the execution of the will (*Estate of Jacobs,* 24 Cal.App.2d 649, 652 [76 P.2d 128]; *Estate of Lombardi, supra,* 128 Cal.App.2d 606, 608-609, 613);

or presence during the giving of instructions for the will and at its execution (*Estate of Easton*, 140 Cal.App. 367, 376 [35 P.2d 614] ; *Estate of Morcel*, 162 Cal. 188, 197 [121 P. 733]). Mrs. Hubbard was present when the attorney suggested the will and its disposition of Mrs. Bould's property and when testatrix adopted the suggestion; she took no part in the discussion of its proposed contents; and she was not present when it was executed.

These facts lead respondents' counsel into the further argument that Mrs. Hubbard, having learned she was not beneficiary of the Bould will on the same day she was notified she could not keep her longer than August 31st, used the refusal of a license as the fulcrum for a threat to turn Mrs. Bould out unless she would enter into a plan for adoption and sole heirship; that the plan for adoption was forced on Mrs. Bould and that she continued under that undue influence at the time of execution of the will. But the first inference, that the consent to adoption was procured by threat or undue influence has no foundation in the evidence. ▓▓▓ It is a question of law whether a given inference may be drawn. (*Blank* v. *Coffin*, 20 Cal.2d 457, 461 [126 P.2d 868] ; *West Coast Life Ins. Co.* v. *Crawford*, 58 Cal.App.2d 771, 774 [138 P.2d 384].) ▓▓▓ And further inferences cannot be built upon such an evanescent primary inference. (*People* v. *Chessman*, 38 Cal.2d 166, 187 [238 P.2d 1001]; *Vaccarezza* v. *Sanguinetti*, 71 Cal.App.2d 687, 698 [163 P.2d 470]; 18 Cal. Jur.2d § 61, p. 481.)

With substitution of names this language of *Estate of Welch*, 43 Cal.2d 173, 180 [272 P.2d 512] becomes peculiarly pertinent: "At most, the record here shows no more than that [Mrs. Hubbard] was so situated as to have had an opportunity to unduly influence the mind of [Mrs. Bould], and that [her] actions and conduct at times might be regarded as suspicious; but to say that from such evidence it may be found that [Mrs. Hubbard] 'overpowered the mind and bore down the volition of the [testatrix] at the very time the will was made' would be to permit [Mrs. Bould's] will to be overturned not upon proof but upon speculation."

We are constrained to hold that the judgment is erroneous. It is reversed. The order denying motion for new trial is not appealable and the attempted appeal therefrom is dismissed.

Wood (Parker), Acting P. J., and Vallée, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied October 24, 1955. Carter, J., and Schauer, J., were of the opinion that the petition should be granted, and Carter, J., filed the following opinion:

CARTER, J.—This case was tried before a most able and conscientious judge who heard the testimony of the witnesses and observed their demeanor and arrived at the conclusion that the will here involved was the result of the undue influence of the proponent. To my mind there can be no question as to the sufficiency of the evidence to support the finding of the trial court in this case, and the reversal of the judgment denying the admission of the will to probate amounts to nothing less than a redetermination of the factual issues by the District Court of Appeal and a majority of this court—passing upon the weight of the evidence and the credibility of the witnesses.

I cannot refrain from again repeating that which I have so often stated in recent years that in certain types of cases a majority of this court has seen fit to usurp the function of the jury and trial judge in determining issues of fact (*Rodabaugh* v. *Tekus,* 39 Cal.2d 290 [246 P.2d 663] ; *Better Food Mkts., Inc.* v. *American Dist. Tel. Co.,* 40 Cal.2d 179. [253 P.2d 10] ; *Atkinson* v. *Pacific Fire Extinguisher Co.,* 40 Cal.2d 192 [253 P.2d 18] ; *Gill* v. *Hearst Pub. Co.,* 40 Cal.2d 224 [253 P.2d 441] ; *Goodman* v. *Harris,* 40 Cal.2d 254 [253 P.2d 447] ; *Pirkle* v. *Oakdale Union etc. School Dist.,* 40 Cal.2d 207 [253 P.2d 1] ; *Burtis* v. *Universal Pictures Co., Inc.,* 40 Cal.2d 823 [256 P.2d 933] ; *Kurlan* v. *Columbia Broadcasting System, Inc.,* 40 Cal.2d 799 [256 P.2d 962] ; *Weitzonkern* v. *Lesser,* 40 Cal.2d 778 [256 P.2d 947] ; *Turner* v. *Mellon,* 41 Cal.2d 45 [249 P.2d 41] ; *Barrett* v. *City of Claremont,* 41 Cal.2d 70 [256 P.2d 977] ; *Estate of Lingenfelter,* 38 Cal.2d 571 [241 P.2d 900] ; *Gray* v. *Brinkerhoff,* 41 Cal.2d 180 [258 P.2d 834] ; *Estate of Welch,* 43 Cal.2d 173 [272 P.2d 512] ; *Keiper* v. *Northwestern Pac. R. Co.,* 134 Cal.App.2d 702 [286 P.2d 47, 288 P.2d 262].)

The types of cases in which this court has seen fit to pass upon factual issues are those relating to will contests and cases in which damages for personal injuries are sought. In criminal cases, however, a majority of this court has seen fit to hold that a mere suspicion is sufficient to support a conviction of crime. (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178 [281 P.2d 250].)

In my dissenting opinions in *Estate of Lingenfelter*, 38 Cal.2d 571 at page 588 [241 P.2d 900] and *Estate of Welch*, 43 Cal.2d 173 at page 181 [272 P.2d 512], I endeavored to express my views with respect to the ruthless disregard by a majority of this court of the constitutional and statutory provisions relating to will contests. What I said there is equally applicable here and I commend the reading of those opinions by those who may.be involved in this type of litigation.

I would grant respondents' petition for a hearing and affirm the judgment of the trial court.